■ PHOENIX TENANTS ASSOCIATION et al., Appellants, v 6465 REALTY Co. et al., Respondents-Appellants, and ROBERT ABRAMS, as Attorney-General of the State of New York, Respondent.—Order, Supreme Court, New York County (Bruce McM. Wright, J.), entered January 24, 1985, which denied plaintiffs' motion for a preliminary injunction and

directed defendants to file an amendment to the offering plan disclosing the existence of the Federal statute and its applicability in a form satisfactory to the Attorney-General, is affirmed, without costs. Nonpurchasing tenants who are eligible to purchase are granted an additional 30-day period from the date of this court's order to exercise their exclusive right to so purchase.

At issue on this appeal is the sufficiency of the disclosure ordered by Special Term to be made in the offering plan for cooperative conversion of the building known as The Phoenix.

At the outset we note that the relief sought by plaintiffs at Special Term was not for the judicial declaration proposed by the dissent, but was for a preliminary injunction to enjoin the scheduled closing on the conversion of the premises on the ground that the sponsor had failed to make necessary disclosures in the offering statement.

The plaintiffs, an unincorporated "tenants' association" and two individual tenants, challenged the sufficiency of the offering statement originally filed by the defendant sponsor and accepted for filing by the Attorney-General. They claimed that the offering statement failed to reveal the existence of a relevant Federal statute known as the Federal Condominium and Cooperative Conversion Protection and Abuse Relief Act of 1980. ([Act], 15 USC § 3601 *et seq.)* The content and purposes of that Act are discussed in detail in the dissent.

Plaintiffs, who brought this action literally on the eve of the scheduled closing and on the sole ground of the alleged misrepresentation or "concealment" by the sponsor in its failing to disclose the Federal statute, sought a preliminary injunction to enjoin the non-Attorney-General defendants from closing title and an extension of the time within which tenants in occupancy would have the exclusive right to purchase their apartments.

Special Term denied the request for extraordinary injunctive relief, but granted the motion to the extent of directing the sponsor to file with the Attorney-General, in a form acceptable to it, an amendment to the plan which disclosed the existence and provisions of the Federal statute and its applicability, and granted the tenants an additional 30-day period following the filing of the amendment in which to exercise their exclusive rights to purchase. Since we agree that this was the proper extent of disclosure required by the Martin Act (General Business Law § 352 *et seq.)* at that juncture, we affirm.

The purpose of the Martin Act is to protect the public and prevent fraud in the offering of securities and in that regard General Business Law § 352-e (1) (b) prescribes filing requirements for real estate syndication offerings, including cooperative conversion plans, "as will afford potential investors, purchasers and participants an adequate basis upon which to found their judgment and shall not omit any material fact or contain any untrue statement of a material fact". The offering statement is filed for informational purposes only, in order to provide an adequate factual basis upon which potential investors, prospective purchasers and participants can intelligently make their choice and found their judgment. Implicit in the statutory mandate is a legal obligation on the sponsor of a cooperative conversion plan to accurately and thoroughly disclose the potential risks involved (see, Matter of Whalen v Lefkowitz, 36 NY2d 75; Matter of Greenthal & Co. v Lefkowitz, 32 NY2d 457; Apfelberg v East 56th Plaza, 78 AD2d 606, appeal dismissed 54 NY2d 680). For this purpose, the relief fashioned by Special Term is appropriate.

In response to Special Term's order, the sponsor has filed an amendment to the offering plan, accepted by the Attorney-General, in which it discloses, in detail, the provisions of the Federal statute, the history of this litigation, the contentions of the parties as to the applicability of the Federal statute, and the content of Special Term's decision and order. The amendment also advises offerees to consult with their attorneys concerning the significance of this material. Of course, the plan disclosed, from the outset, the terms of the agreement which provide that, on the closing date, the apartment corporation will enter into a noncancellable, five-year management agreement with an affiliate of the sponsor and will also enter into a noncancellable, 15-year master lease with the sponsor covering commercial space, with options to renew for an additional 35 years. These agreements reflect, on their face, that they are, as described in the dissent, "sweetheart" deals or windfalls for the sponsor. Clearly, the totality of this information is sufficient to provide "an adequate basis" upon which a purchaser may form his or her judgment, and satisfy the "informational" purpose of section 352-e.

Plaintiffs, however, now seek more. They would, in effect, have this court "guarantee" the economic positions of the purchasers in this prospective business deal between private parties by issuing a premature advisory ruling on the applicability of the Federal statute to the management agreement and master lease at issue in this plan, and requiring inclusion

of that ruling in the prospectus. Such is not the function of the disclosure requirements of the Martin Act, nor is it the function of our courts to issue advisory opinions.

The offering statement of a cooperative conversion plan can only reveal the facts and figures from which one can estimate the future fiscal risks and benefits of purchase *(see, Schumann v 250 Tenants Corp.,* 65 Misc 2d 253). These risks and benefits cannot be predicted with precision. It is sufficient that the sponsor has revealed the risks involved, and, in this case, revealed a possible potential benefit for prospective purchasers under the terms of the Federal statute in relation to cancellation of the management agreement and master lease. Prospective purchasers can utilize this information and seek legal advice as to the advisability of the transaction from their own private attorneys, a far more appropriate avenue in this context than seeking declaratory relief from the courts. *(See, 1045 Park Ave. Tenant Assn. v 1045 Park Ave. Owners Corp.,* 119 Misc 2d 339.)

The CPLR confers the power to render a declaratory judgment as to the rights of parties to a justiciable controversy (CPLR 3001). The power to render a declaratory judgment does not, however, extend to the giving of an advisory opinion with regard to a future event which is beyond the control of the parties and which may never occur. "Thus it is settled that the 'courts will not entertain a declaratory judgment action when any decree that the court might issue will become effective only upon the occurrence of a future event that may or may not come to pass' " *(New York Public Interest Research Group v Carey,* 42 NY2d 527, 531).

The conjectural nature of the future events which must occur before cancellation of the lease could be effected under the Federal statute emphasizes the inappropriateness of granting declaratory relief at this time. First, it is necessary that the requisite number of tenants buy their apartments so that the conversion plan is consummated and becomes effective. Then, developer control over the apartment corporation must terminate, following which the owners of the corporation must, by a two-thirds vote, elect to terminate the lease within two years after the plan is consummated. Only upon the happening of all of these future events would termination of the "sweetheart" agreements be possible. At this juncture, when all of these essential prerequisites have not yet come to pass, and may never do so, a declaratory judgment would be a premature impermissible advisory opinion.

It is also of consequence that we are dealing with a rela-

tively new Federal statute which has not been extensively interpreted. While the dissent's analysis of the applicability of that statute generally to agreements such as the master lease is most persuasive, the case of *West 14th St. Commercial Corp. v 5 W. 14th Owners Corp.* (625 F Supp 934), which is cited by the dissent, demonstrates the wisdom of refraining from pronouncements in the abstract and reserving the decisional function for the realities of a justiciable controversy. That case holds the Federal statute inapplicable to garage and laundry sweetheart leases, similar to those at issue, within the framework of the particular facts there present. It is the facts that actually develop in the instant case that will control the ultimate determination and not the facts that "might or might not be." *(Cf. 233 E. 86th St. Corp. v Park E. Apts.,* 131 Misc 2d 242 [Sup Ct, NY County, Tompkins, J.].) The language of the amendment ordered by Special Term, and filed by the sponsor with the Attorney-General, has the requisite certainly and provides all the necessary information to enable a prospective purchaser to make a reasoned judgment at this stage of the cooperative conversion process.

We also note that Special Term properly balanced the equities in denying temporary injunctive relief to the plaintiffs, one of whom is a lawyer, who waited until one day before the scheduled closing date to seek such relief by reason of the omission from the plan of any mention of the Federal Condominium Conversion Protection and Abuse Relief Act. Such delay was particularly inexcusable in this case where plaintiffs' counsel had been aware of the statute, and had even written articles about it, for some time prior to the commencement of the action. Moreover, plaintiffs could hardly claim any unequal bargaining position by reason of the omission of any mention of the statute from the offering plan since they had the benefit of advice from highly expert counsel on this issue, well before the sponsor was required to formally disclose the information. Concur—Sandler, J. P., Ross and Ellerin, JJ.

Asch, J., dissents in a memorandum as follows: The outcome of this appeal of necessity turns on the extent of the obligation to disclose information to prospective buyers on the part of those offering a cooperative plan. I dissent in this appeal and in the companion case, *2 Fifth Ave. Tenants Assn. v May-Carlton Assoc.* (119 AD 436), because I believe that under the law today, there is a responsibility to disclose *all* significant facts which may bear on the desirability of the cooperative offering.

To announce the death of caveat emptor would be prema-

ture, to say the least. Nevertheless, the counterpoint of bargaining rights and responsibilities between buyer and seller, in many fields such as foods, drugs, cosmetics and real estate, is in a state of flux, with the objective of affording consumers some degree of protection. For real estate buyers, Congress has enacted the Condominium and Cooperative Abuse Relief Act of 1980 ([Act], 15 USC § 3601 *et seq.).* In New York State, the Martin Act (General Business Law § 352 *et seq.)* has sought to ameliorate the burden imposed on purchasers and prospective subscribers to shares in a corporation by requiring offerors to make full disclosure of all information which might affect the buyer's decision. The Attorney-General of the State of New York is endowed with substantial authority and extensive machinery to ensure that prospective purchasers will be furnished with all the relevant information which may bear on whether they invest. In this situation, significant facts were not furnished.

On or about June 14, 1984, the Attorney-General accepted for filing, pursuant to General Business Law § 352-e *et seq.,* an offering plan for the conversion of the premises known as The Phoenix (located at 160 East 65th Street and 187-189 East 64th Street, New York City) to cooperative ownership. On or about November 21, 1984, defendant sponsor, 6465 Realty Co., declared the plan effective, notified the tenants that the requisite number of subscription agreements had been obtained and that the sponsor was obligating itself to complete the conversion by transferring title to the premises to the Phoenix Owners Corp., the cooperative corporation, on December 21, 1984.

This action was commenced on December 18, 1984, and sought a preliminary injunction to enjoin the private defendants from closing title on the premises and to extend the time within which tenants had the exclusive right to purchase the shares allocated to their apartments.

The offering plan failed to disclose certain information critical to an intelligent decision whether to purchase shares. First, it failed to disclose the existence of the Federal statute known as the Condominium and Cooperative Abuse Relief Act of 1980 (15 USC § 3601 *et seq.).*

The plan did not reveal that the 50-year master lease described in the plan (to be entered into between the cooperative corporation and the sponsor) will or may be canceled by the shareholders without penalty upon the closing of the conversion. The offering plan does provide for a *15-year* master

lease between the cooperative corporation, as lessor, and the sponsor, as lessee, of the commercial premises in the building. The master lease is renewable by the sponsor for additional terms of 15 and 20 years for a maximum total of 50 years.

Under the master lease, the sponsor acquires the lessor's interest and collects the rent with respect to all of the commercial leases in the building. It also allows the sponsor to keep the rent from all existing commercial leases on the premises and to enter into new leases and keep the rents from those as well, for over a 50-year period, including renewals. In exchange for this right, the sponsor must pay the cooperative corporation a fixed rent that is set forth in the offering plan which does not depend on the rent the sponsor will receive from future commercial tenants. The potential of a windfall for the sponsor is readily apparent from the low rent which the sponsor must pay the cooperative corporation.

In 1980, Congress passed the Condominium and Cooperative Abuse Relief Act (15 USC § 3601 *et seq.)*. The purpose of the Act, as stated by Congress, is "to assure fair and equitable principles are followed in the establishment of condominium and cooperative opportunities". (15 USC § 3601 [b].) The Act applies to cooperatives containing five or more units where an interest was offered for sale through the mails. (15 USC § 3601 *et seq.)* Finally, the Act provides for concurrent jurisdiction in both the State and Federal courts to enforce its provisions. (15 USC § 3612.) Under the circumstances herein, the Attorney-General has taken the position that the offering plan for The Phoenix is subject to the Act, and I concur.

By its terms, the master lease cannot be canceled by the cooperative. If the plan is subject to the Act, however, the right to terminate the master lease by the independent board of the cooperative arises from the Federal Act. A prospective purchaser who believes that the cooperative corporation is not to receive sufficient rent under the "Sweetheart" master lease might not purchase unless he is informed that the Federal statute will permit the cooperative corporation to cancel the existing "Sweetheart" master lease. Even those who decide to purchase might use the better bargaining position which the Federal law affords to negotiate a better deal for the tenants before committing themselves to purchase. The sponsor's omission of the critical rights granted by Congress deprives the tenants of that opportunity.

Special Term required the private defendants to disclose the existence and provisions of the Condominium and Cooperative Abuse Relief Act *in a form satisfactory to the Attorney-Gen-*

*eral,* and granted tenants an additional 30 days to purchase at the insider's price, or if they had already purchased, 30 days to rescind. On April 1, 1985, the Attorney-General accepted for filing an amendment (the Tenth Amendment) submitted by the defendants pursuant to Special Term's order, which sets forth the provisions of the Act, the history of the litigation, the contentions of the parties and the contents of Special Term's order.

The applicability of the Federal statute to cooperatives in New York will have a substantial impact on the decision of tenants to buy or to rescind. If the Act applies, and the master lease is terminable at will, the cooperative corporation could realize a great increase in income, thereby lowering maintenance costs to those who purchase. Tenants and other potential purchasers have a right to know whether that master lease can be canceled and whether the maintenance costs will be reduced drastically *before* they decide to buy. Instead of requiring the sponsor to disclose that the master lease *can* be canceled, Special Term essentially left the matter of disclosure up to the Attorney-General and gave the tenants (both purchasers and nonpurchasers alike) only 30 days in which to make their final decisions.

The Federal statute applies to the master lease by reason of the broad, general language of the Act. *(See, West 14th St. Commercial Corp. v 5 W. 14th Owners Corp.,* 625 F Supp 934 [SDNY 1986, Knapp, J.].)

As demonstrated by the Congressional findings and purpose contained in 15 USC § 3601 (a), Congress intended that: "(3) certain long-term leasing arrangements for recreation *and other condominium- or cooperative-related facilities which have been used in the formation of cooperative and condominium projects* may be unconscionable; in certain situations State governments are unable to provide appropriate relief; as a result of these leases, economic and social hardships may have been imposed upon cooperative and condominium owners, which may threaten the continued use and acceptability of these forms of ownership and interfere with the interstate sale of cooperatives and condominiums; appropriate relief from these abuses requires Federal action". (Emphasis added.)

Congress took special effort to add "and other condominium- or cooperative-related facilities". Similarly, in section 3607 (a) (1), the Act allows a cooperative association to terminate, without penalty, only those contracts or any portion thereof which provide "for operation, maintenance, or management of

a condominium or cooperative association in a conversion project, or of *property serving the condominium or cooperative unit owners in such project"* (emphasis added).

The master lease for The Phoenix falls within the Federal definition. There is a close nexus between the master lease (for the operation and maintenance of garage space and the commercial areas within the premises) and the Federal definition of "cooperative-related facilities" and of "property serving the condominium or cooperative unit owners in such project". The master lease relates to facilities which directly serve the cooperative by providing important accoutrements of urban living.

Although we may not be concerned here with a health club or some other recreational facilities, a garage is no less a facility which serves the cooperative. Perhaps in some geographic areas a health club would be a facility in great demand by cooperative shareholders or condominium unit owners. A garage space in Manhattan, on the other hand, is a highly desirable facility serving the needs of cooperative shareholders.

The cooperative-related nature of the garage lease becomes even more apparent in light of the certificate of occupancy, which requires a garage "which has attendant parking for at least 73 and not more than 150 vehicles" and "states that such parking is to be primarily for residents." In addition, "residents may recapture any of the non-resident parking spaces upon 30 days' written notice to owners."

The provisions of the master lease concerning banks and other retail stores, which do not offer the same convenient and important service as a garage, nevertheless relate directly to the ease, comfort and economy of the cooperative shareholders. Thus, the garage lease and, to a lesser extent, the remainder of the master lease serve the cooperative and are within the purview of the Federal statute.

Special Term properly recognized the inadequacy of the disclosure in the offering plan because the plan failed to mention or describe the Federal Act. But the disclosure ordered by Special Term is insufficient because it merely requires "[d]isclos[ure of] the existence and provisions of the federal statute * * * together with the applicability of the statute, in a form which shall be satisfactory to the Attorney General". The private defendants submitted an amendment which simply explains the contending positions regarding the parties, and the Attorney-General felt constrained to accept it

for filing without prejudice to his rights to seek judicial review.

This Tenth Amendment fails to provide sufficient information to a lay person for an intelligent decision. To make sense to a prospective purchaser, the Tenth Amendment should disclose that the master lease, or at least the part relating to the garage, is terminable by the shareholders in accordance with the terms of the Federal statute. A determination by this court regarding the applicability of the Federal statute to this master lease would be a major step forward in providing the public with the information it needs. Furthermore, it would be consistent with the Federal statute and the Martin Act, which are intended to dovetail in this regard.

Fortunately for the public in the State of New York, the Federal and State laws may be read and applied together for better protection against long-term sweetheart leases, such as this master lease.

For the foregoing reasons, it seems appropriate to modify the order appealed from to the extent of declaring that the Condominium and Cooperative Abuse Relief Act of 1980 (15 USC § 3601 *et seq.)* applies to the master lease at The Phoenix requiring the non-Attorney-General defendants to file an amendment to the offering plan disclosing that the master lease is terminable pursuant to the Federal statute and, granting a reasonable period of time for nonpurchasers to subscribe and for subscribers or purchasers to rescind their subscription agreements or their completed purchases.